Mr. Wimbley, whenever you're ready, you may proceed. Mr. Wimbley, I represent in this appeal the plaintiffs, Tony and Elizabeth Pugh, in a I know that you all have read all the briefs, and I don't need to go through them, because it's a very pretty long story, factual history, relating to all the issues, and so I'm going to try to address the three main issues that we raise in our briefs so as not to waste much time. There are three primary issues that we are presenting before this Court. The first was the defense violations of Supreme Court Rule 213 that it deprived the plaintiffs of a fair trial. The second issue is that the trial court erred in denying both the motion for summary judgment or partial summary judgment in favor of the plaintiffs regarding a Ray Ipsa count, I believe it was count three of our complaint, and also in denying a jury instruction for Ray Ipsa. The third issue is also a claim that we were denied a fair trial based upon the improper comments and argument that was presented during the course of the trial, and we will develop that a little bit further, obviously, depending upon Your Honor's discussion and questioning on the different issues. The first issue is kind of bifurcated because on the one hand, the 213 issue was relating to some parts of the failures of the court to grant objections relating to 213, but also curiously, there was a witness, an expert that was disclosed and called by the defense that actually violated 213, as we indicated in the briefs, as you said, consistently. Even yesterday. Do you – the defense argues that you forfeited that because you didn't include it in post-trial motion, you didn't object to trial. What's your response to that? The response to that is just we actually did – we did present the issue of the improper comments, both by Lichter, which is the expert that was called by the defense, in our post-trial motion. Specifically, we did identify it. However, I believe what counsel was arguing was that we needed to basically, I suppose, in terms of the post-trial motion, file what I would consider to be almost a treatise on every issue which we could not. Well, it doesn't have to be a treatise. If 1202B says you must particularly specify the grounds that you're relying on, and then Supreme Court Rule 366 says you can't appeal a ruling without specifying the grounds of the motion beforehand. So, I mean, I realize you don't have to write a treatise on each objection, but don't you have to at least clue somebody in as to what your specific 213 objections were? Because the post-trial motion at page 18, it's one sentence, correct? It is, Judge. Okay. It is one sentence that identifies the issues relating to the substance of the 213 in regard to Lichter. And the reason why I said that, there were actually several objections that were made during the course of the trial. So it's not a situation in which counsel is blindsided by the – our request to say that there was some improper testimony. In fact, related to Lichter's testimony all through it, we were – we had objected and the trial judge consistently not only granted our objections, but also remonstrated with the defense counsel about the actions of the expert Lichter. Well, it's not so much the opposing counsel having an idea of what you're arguing, but it's fairly clear to me that the trial court had no idea what you're arguing about 213. Granted, it was a different trial judge. It was Chip Mulligan, retired. Right. Well, you have a different judge who then picks up the ball and runs with it, probably reads the transcript, I would imagine. And then in his ruling, Judge Foos, I think it was, said on pages 18 and 19, there are some rather general errors alleged without citation to specific testimony or transcripts. And then he basically says that he doesn't – I do not know what this refers to. So he was not clued in at all. He didn't even rule on the 213 issue because he didn't know what you were arguing. Judge, I would say that we did cite Galev v. Scampton, which requires that a post-trial motion would provide a simple and succinct statement of the factual legal basis for the parties' contentions of error. While we do understand that Your Honor is concerned about it not being fully developed, the idea and the fact that we included it both within the parameters in our motion as well as objections at trial, I believe, provided them with enough, with this simple statement that they need in order to be able to understand the issues and the legal basis for what our contentions were. It's not so much our concern, it's the Supreme Court's concern. No, I understand. I mean, you know the case law. You've got to give the trial judge a chance to correct any errors that he or she may have made. That is correct. However, within the confines of not just that one small issue, the fact that there were various objections and several objections at the trial level, at the trial level regarding Victor's testimony throughout almost his entire testimony, certainly put not just counsel on notice that that was the case. And unfortunately, when initially it was written, the motion was written anticipating Judge Mullen to rule on it, at the last minute it just fused. I mean, literally one day it was just Mullen is not here anymore, she's not going to hear it. It just fused. And maybe that was in our fault because we had an extensively long trial. We had, as you see from when you went back and looked at the transcripts of the citations to the record, Judge Mullen was explicit about many of the contentions and the objections that we had related to the testimony of Judge, of Victor. And so when we get into the issues of those objections, when we talk about Victor's testimony, there was two parts of it. One of it was relating to the fact that he provided an undisclosed opinion relating to the, he was actually not just a causation witness but also the standard of care witness. And he also testified about certain things that not only were problematic for the plaintiffs but problematic for the court. The court consistently said to defense counsel, defense counsel, what is he doing? She specifically told him several times, do not speak on, for example, don't mention any studies that you talked about about wrong site surgery. Don't do it. Consistently, the witness did. Not only that, but he described the one off-level surgery being a known complication which was objected to, of course. And from that point, that was an undisclosed opinion. Wait, wait. I don't know that there was an objection to that part. Dr. Lichter's testimony regarding wrong site surgery being a known surgical complication, I don't believe there was an objection to that point. There was an objection to the wrong site surgery studies, and that was sustained several times with corrective instructions being given by the court. Judge, I believe that the initial time it was offered, it was offered within the same sentence. There was an objection that was made to that. He said that there was a known complication and it was known from the studies. There was an objection to that. It was right after the other was in the same sentence. So the objection that was made was we would have cared for both of the issues that was raised, and that carried on from that point, because from that point on, Lichter focused on the issue of the studies and continued to focus on it, even after being admonished by the court. And even after defense counsel said, well, let's not talk about the studies, and then he continues. The reason why that comes to play is because even the judge says, well, now, because she commented on his lack of specificity and the vague nature of his responses and responded, it appears to me the genius of him being vague is becoming more and more clear to me. It required for the defense counsel to continuously feed the State, I mean, the witness on the standard of care for the defense, the entire testimony, to the point where the judge had to remark on it and said, I've never seen anything like this. Those issues, the issue about Judge Lichter's testimony, it certainly deprived us, for the plaintiffs, to be able to properly present our case. And also it shows, and I'll get to this a little bit later on, from the very beginning, because this happened early in the trial, that there was something that seemed to be afoot. Apparently, I don't know what the situation was in between Lichter, but when he testified, there was no disclosure of a very specific issue about it being a known complication. The very question that was afoot in regard to the entire issue of negligence in this case was whether or not wrong site surgery, we call it wrong site for, I guess, lack of a better term. In reality, there was the doctor operated at the wrong lumper level. He just missed it. Instead of operating at L3, L4, L5, he operated one level up. The very focus, the entire question, really, about whether or not, in fact, there was negligence is on that issue. By Lichter stating an undisclosed opinion, let's say, it's basically, well, one level off surgery is commonplace. And, in fact, it's so common that it's talked about in these various places that we go to when doctors get together and we have, there's known studies about this. That was injected into the trial very early on. At that point, there was consistent objection to it and consistent discussion by the judge. And I was pretty astounded and happy to see the problem a lot of times in reviewing courts is it's difficult to try to, as they say, substitute your judgment for that of the judge, the trial judge, because obviously you weren't here to assess not just the credibility of the witnesses but also the effect of the testimony upon the jury. But in this particular case, you actually get to kind of peek behind the curtain because Judge Mueller was very explicit about how she felt about some of the conduct and the improper things that were going on by, directed either by defense counsel or defense witnesses. That also brings up Paul Miller, who was the defendant in the case. So he was acting in a hybrid role, acting both as an expert, they listed him as an expert in their 2013 disclosures, and as a layperson, a fact witness as the doctor in the case. The reason why that's important is because Paul Miller also offered something through 2013 that was not disclosed. And this was a key issue relating to the standard of care. Essentially, Paul Miller said, well, when I got, when I opened up the plaintiff's back and I saw at L3 and L4, which he operated on, and L2, that he saw what he expected to see defense tries to say that, well, that was simply just making an observation. But it wasn't just a surgical observation. What that did, what he was attempting to say was, well, when I got in to the back and I saw that there was some pathology at this level, at L2, L3, he basically was implying, well, that's why I was confused and thought that it was L3 and L4 and operated at the wrong site. That is not an observation. That is an opinion. That is a 2013 opinion that wasn't disclosed, not in the deposition, not in any written discovery, not at any time prior to that case. Was there an objection to that? Yes, there was. And so, I'm sorry. On that particular issue, I apologize. There was not. Right. I apologize. But why, why exactly is that not an observation? That one I don't understand. Would you be able to observe that? You're asking me? Yeah. I can answer the question. The reason, for example, had Dr. Kornmutter said, when I got in, I saw that there was some pathology at L2 and L3. The fact of the matter is, according to the records, there was only mild degeneration at L2 and L3. A radiologist films that was taken three weeks prior basically said that the rest of the spine, other than L3, L4, and L5, appeared normal, and that there was just some slight degeneration at L2, L3 level. However, there was disherniation at L3, L4, and L5. So for him to even say that, that he found what he was looking for, is contrary to the medical records. Secondly, though, if he just simply said that I saw, I saw that there was some deterioration at L2 and L3. You're right. That would be an observation. However, for him to add, and in addition to that, that made me know what I was looking for. I was expecting to see that based upon the preoperative films. That's an opinion. That's saying, well, because of the degeneration at this level, that's what I expected to see prior to operating at the wrong lumbar level. But they didn't disclose that at L2 and L3. They did not disclose that at L2 and L3. They disclosed him as an expert, though. They did disclose him as an expert, and the 213 disclosures, if you saw them, was basically like a dictionary. The group, the – I understand trying to make sure you can get everything in. However, the law does not require for that. It requires very specific disclosures about particular issues. In this – if you went through all the 60 pages, or however long it was, there was not one shred of evidence. The – that Perlmutter was going to say when I got in. I confused L3 and L4 with L2 and L3 because of the pathology that was there. And he couldn't because the medical records didn't even allow for that, and I believe that that was – Were there any objections that were – I mean, all the things you're talking about now, a lot, you know, Lichter's testimony about wrong site surgery being an old competition, wrong site studies. You objected to many of these, and then some of them you didn't object to. I mean, the trial counsel didn't object to them. The ones that were objected to were – the objections were sustained, were they not? They were. And instructions given to the jury to disregard certain things. I mean, there were corrective instructions given throughout this trial. There were, and I believe that actually reinforces the argument that we made. Don't we then – isn't there a presumption that the jury followed those instructions? The – there is a presumption. However, it gets to a point, and in fact, I believe that the judge began to see that point because even the judge, during the course of this, as these improper comments began to mount and continuously mounted up, she made a comment even that said, hey, this is highly improper. I will open up your ability to ask more or less for a motion. I'm not saying – and we presume that was for a mistrial. I'm not saying that it would be granted. But certainly the level of the improper comments from not just the defense counsel, but the witnesses put a – as she even puts it, as the judge even puts it, a cloud of impropriety because it started a mistrial. It was never made. That's correct. A mistrial was never made. And that is an issue. Unfortunately, what should have happened was because she tabled it, she said, we'll address it at another time, and we never did. That's nothing that I can put on the defense counsel. Whose job was it to bring it – whose job would it have been to bring it up? It was certainly our job, Judge. It was a plaintiff's job, and there's no way to get around that. Whether or not we caught up and fought in the battle of all these things that were going and then neglected to remind the court, that is, of course, on us. However, we had cited Rutledge v. St. Ann's Hospital that says that your Honor's can actually, under your authority, can actually step in and where there are sometimes, as we did, objected to certain aspects of the improper testimony and put it in our post-trial motion, your Honor's could actually step in under your authority, I believe under Rule 366, and be able to say that there's plain error here, that the failure for us to object to maybe one or two of these issues with the litany of the other issues that we brought in, Judge, your Honor could take notice of that and do, as they say, to achieve a just result. And the reason why I say that is because it would have to be factually that this case had to be closed. It would have had to be closed. When you have a situation in which the doctors and counsel, I will be the first to admit it, did an excellent job. But what he did was just improper. He took beyond just what he could do and what he did do and injected, as the judge says, this cloud of impropriety not against the plaintiffs for their failure to follow up with the medical advice, not against the plaintiffs' experts for their bias financially or otherwise, but against the plaintiffs' attorneys, creating this conspiracy that we somehow were colluding with witnesses to either concoct testimony or to do other things, to the point that the judge actually said, shame on you. And I can't – I'm surprised that I can't believe that you're doing these things, saying there's no proper purpose that you could be offering this evidence for. And all of these things, when they continuously grew higher and higher, it didn't stop. It didn't even stop after it had been admonished. After it had been admonished several times by the judge, it continued all the way through closing arguments. All the way through closing arguments. It would be one thing if after the first admonishment, counsel said, you know what, I see the error of my ways. I misspoke. I didn't mean to do that. But after that, even all the way up to closing arguments, there were three statements that we had to object to that were just not true. And those statements related to things that were, again, impugning the credibility of not anything else but the plaintiffs' attorneys. And that is highly prejudicial. And that should never have a place in this law. We do everything that we can to ensure and restore people's faith in the institution that we have. That's why we do the things that we do. And it clearly appears that that was transferred. Counsel, your time is up, and we will give you an opportunity to respond if you choose to. Thank you very much. Thank you. I'm Richard Hickey, counsel for the defendants' appellees in this matter. Court, this was a case about a very complex disease pattern in a complex area of the spine in an individual who had aberrant anatomy. All right. Well, notwithstanding how complicated it was, it seems to me, looking at this record, that the admonitions, the orders, and the frustration of the trial court should have been obvious, not by the first, maybe not the first time to say it, but certainly by the time you were getting into this case. And why didn't you listen? By the time I was getting into this case. Into questioning Dr. Lichter and questioning Dr. Promutter. Well, can I address those one at a time? With Dr. Promutter, as has already been pointed out, the objection that's raised there was not objected to at the time of trial. He was disclosed that he was going to talk about what his findings were at surgery. That was clearly disclosed. He was asked about it in his deposition. His deposition wasn't attached because he did talk about what he found at surgery. The objection regarding the plaintiff's anatomy, as Dr. Promutter was objected to, was sustained with the corrective instruction he was given. So everything regarding Promutter wasn't objected to. Not everything. That's correct. And you just started your argument. That's why I asked you about this was a difficult anatomy. So you're using the same word right here that was objected to in the trial court as not being part of disclosure. And it was objected to, Your Honor. I agree. And that one was sustained. However, here is the sequence that they are referring to. It's on Supplemental Record 747. And it's, I ask the question, you heard Dr. Gerstein say when you got into the operation, you had to look to see if you're getting into the pathology you expect. Did you hear him say that? Answer, I did hear him say that. When you got down to the level of 3, 4, what did you encounter? He said, I found what I expected. I found a bulging disc, arthritic joints, spinal stenosis, and spondylolisthesis. When you got up to L2, 3, what did you find? I found bulging disc, spinal stenosis, and some arthritis. Did you dictate an operative report? In this case, I did. And then I went on from there. There was no objection to the point that is raised at all. Nor could there have been in good faith because this was discussed in his deposition and in the disclosure we specifically indicated he's going to talk about his operative findings. But radiology did not show that L2, L3 area as having that pathology? No, I understand that's in plaintiff's brief, but that's not accurate. There was an MRI done a few months before. It wasn't done by Dr. Perlmutter, but it was done and it was referred to him. And in that MRI, it described all of these changes at L2, L3. They did. So it was there. We sat in as they have later objections to Dr. Lichter saying it, and she sustained it and said, no, this was revealed. It said he's going to go over the MRI findings, and he's looked at the MRI and he's going to explain it related to the complaints that the patient was making in this case. What's happened here is things have been kind of flipped around. A new issue was created that the plaintiff is claiming here on appeal that Dr. Perlmutter somehow said, oh, I'm justified. That's why I changed my operation and went and operated on this level because there was this pathology. That argument was never said. That is what they're saying was in Rule 213, that we made that argument. But it's important in their briefs. They say it's by implication because it actually never was made. What happened was Dr. Gertzke, the plaintiff's expert, said, if you got to L2, L3, I assume there would have been nothing there because he didn't look at the MRI report, okay, and he didn't look at the MRI. He said, I assume there would be nothing there. And if you get to an area you're going to operate on and you find nothing there, well, that's a red flag to you that you're at the wrong level. So you have an expert for the plaintiff who didn't review the MRI, didn't review the MRI report, and then made an assumption nothing was there. So that's what we do as trial counsel. We say, and this was all disclosed, no, there was pathology there as proven by the MRI, and then he'd already disclosed he found pathology at that level. That might be turned around, as you say, but it is clear from the transcript that there were a lot of objections that were sustained by Judge Mullen and then a cautioning instruction to the jury. After that's done so many times, Mr. Hickey, and the bell has been rung so many times, isn't that prejudicial to the plaintiff's case? It could be, Your Honor. And I don't just want to give a yes or no because it all depends on the detail of what we're referring to. The articles for Lichter, I agree that what Lichter had. So you're talking about the wrong site articles? Yeah, the wrong site articles. We're calling them. In the disclosure here it says he's reviewed vast amounts of literature over the course of his education, training, and experience. Knowledge of that literature has formed part of the basis for his opinions in his case, and he will relate that literature to his opinions, okay? He had literature at his deposition. The word Lichter is in his deposition. I know it wasn't attached, Your Honor, but the word Lichter was mentioned multiple times, and I might say literature, I might say articles, different things. And he was asked about some of it but not all of it. The question I asked to him was to explain, and I have that, to explain, does he have an opinion whether Dr. Perlmaner complied with the standard of care? Yes, he did. And then I say, after two more questions, will you explain to the jury why knowing it's a wrong site surgery doesn't change your opinion? And he goes on and talks about how there are risk complications. He goes on, and it's a long answer, and he said, at the end, I mean, there's literature, too, to support those. I have some of those. Mr. Lee said sustained, that's stricken. Ladies and gentlemen, put any notion of literature out of your mind. I'm reading from Supplemental Record 428, okay? And then I said, Doctor, it's been discussed at those conferences you've been at, and you review of materials the incident rate of these types of complications. Now, that's not objected to. Clearly, that was in our disclosure. Clearly, he was questioned about what conferences he was at and these discussions. And he said, well, I was trying to get at that's a well-known complication. And he goes on and he says there's a number of studies that have looked at that. And I said, no, Doctor, explain without referring to the studies, okay? And then he started to get into it, and the court called a sidebar and said to me, you know, he's getting into the studies. And I said, I know. I didn't ask him to. In fact, I directed him not to. The court said, I heard you direct him not to. Why do you think he's getting into those? And I said, Judge, because he disclosed it. He had it in his debt. You know, we'll move on. He didn't talk about he said literature. I mean, I realize that what I'm now going to say is going to sound foolish, but he could have been talking about Shakespeare. You wouldn't have asked about Shakespeare, you know, at the trial. So why didn't you specifically identify the literature at the deposition, even though he looked at hundreds of them? Why didn't we identify the specific literature? We had it there at his deposition. Well, was he shaking it in front of everybody? No. Okay. It was a very long. I'm sure it was. It was a six-hour deposition. Well, a couple more hours to identify is tough, but we've done it here today. Those are two comments, Your Honor, that he made, and it did come up on cross-examination on a question where they asked him, well, what is your basis? And he listed his review, the MRI, and he did put, and he said the literature. That happens in all these medical malpractice cases. This wasn't where he came out and started citing Dr. Goldsby on this and that or the other thing. So it did come up on cross when they asked him, well, what's your basis? And he said it, which was a disclosed basis. I just read to you our disclosure. Counsel said that our disclosures were too long, and they did object to them, and they moved to strike them. They said they were too comprehensive and there was too much in there, and that would inhibit them from objecting at the time of trial. And the judge said, well, no, 213 is to disclose things, because I argued I don't want 213 objections at the time of trial. So, I mean, on that issue with lictors, it did happen twice. The judge did make the comment, called me up there and said, why is he saying it? You even said to him not to ask it. That didn't prejudice the plaintiff to the point where the plaintiff didn't get a fair trial. If I could move to the comments that are directed to me about Dr. ‑‑ or not Dr., excuse me, Mr. Blank, Blankenship. Can I just add? Sure. I just want to ask one question. One of the possibly preserved issues regarding this 213, and then we can move on, is whether Zellbee testified that level 23 pathology justified the one‑site surgery. He never offered that opinion. You notice there's no site in their initial brief, and there's no site in their response brief that Zellbee offered that. They're saying that you could take him to ‑‑ you could take what he said and assume it was for a liability purpose. What it was is we disclosed him, and Judge Mullen commented on this, we disclosed him, that he was going to trace the man's back pain history. He's a damage expert. He's a damage approximate cause. He was going to go through the different areas and relate complaints to different areas of the spine, what's being corrected and not, and after one of the things he got in is after somebody's had back pain like this for more than 16 years, when you operate on them, that's not going to go away. You're trying to avoid further deterioration and get some improvement. But Gertzbein, their expert, admitted, oh, no, he's not going to be pain free. He's not going to be disability free. Their other expert admitted, no, no, no, no, he's going to have substantial, he had so much wrong. So what we were doing with Zellbee at that point is we were going down the spine and relating each of the things, and you note in the record it talks about a chart because we had a chart. Here are his complaints. Here's the level of spine. And here are his complaints. Then we had a second chart afterward to show how everything was improved. It was better. So he was not addressing. I'm glad because I know that's in their brief. It's in their reply. But there's no citation where he actually offers any opinions on the standard of care. He did not. I asked him a question. In fact, I said, Doctor, you're not here to testify, or are you here to testify on the standard of care? And he said, no, I'm not testifying on the standard of care. You were going to comment on boycott treatment. Yeah. That is where the, once again, the statements about me bringing it up over and over again, which is something that I disagree with. What happens in this case is it turned out Mr. Blankenship and Mr. Lee have a very close relationship. Lee Blankenship is a rehab expert, a vocational guy, but who hasn't done any vocational work since 84. He's a pure litigation testifying expert. He agreed that he carries, he gets 200 cases a year, and he carries an inventory of 350 to 400 cases. He's been retained by Lee approximately six times a year for 27 years. So, I mean, that's just a fantastic number of retentions. And he testified that he sees all these people in Lee's office. Okay? That's where he is. Lee has like a three-flat, a three-story building that's his office. And his own personal office is, I can't remember if it's the second or the third floor, but he's got conference rooms and other things in the building. And what had come out was I asked him, I was asking about the day he saw, because they got into the fact that he saw this Mr. Pugh in the office, where Pugh lives up here. And it's kind of a long trip for somebody who supposedly can't even travel to go down there. So, very quickly, I put it up. He wrote down the day, and I asked, he had asked, he volunteered that he saw him in Lee's office the first time. Then I did reiterate that. Okay? And then I went through the issue of what he did in the office. Then we came back to it later because what happened here was he wrote a report, Blankenship wrote a report saying this guy's disabled from working forever. But two days after he wrote the report, he went back to work full-time and worked for a year. And when we were getting to the expert depositions, Blankenship is in Lee's office seeing another client of Lee's. And Lee comes up and says to him, hey, you better write a new report because you've got this guy never working again, and he's gone back to work. And Mr. Lee objected to that, saying that it was implying that he was doing something wrong and that that was impugning the legal profession. And I was impugning the fact that they would hire somebody who does 400 cases and actually has seen people. I believe that's fair game, and I've been in trials where that has been absolutely. Well, couldn't you have done that with simply identifying how many cases he has, which apparently you did, how many cases he inventories, and the name of his book, How to Maximize and Minimize Your Damages? That's pretty significant evidence right there. The jury thought so, too. Well, but you added certain things. I'm saying why couldn't you have just gone with that information? Well, what he did in there, it was interesting. In his article to the plaintiff's bar in Indiana was how to maximize. He had a game plan. If the treaters are not saying there's enough disability, bring in a rehab expert and then hire somebody to do an exam and find him disabled and then make your claim. What they did then is they followed that. They hired Blankenship to examine him to increase this calculation of lost abilities, and then they sent him to another orthopedist in Indiana to find him disabled, where the treaters didn't find him disabled. So I pointed that out as well, Your Honor. And here's the sequence of questions. It's at the record 437 to 439. I just ask now, you learned in 2016 Mr. Pugh had actually gone back to work, correct? Yes. And you learned that from Mr. Lee? Yes. And then I said, and that was your deposition was being set up, and you said you would need to recalculate. There was an objection. I didn't know what the basis was because that was right out of his deposition, and that was sustained. But I still don't know why that was improper. Were you having a conversation with Mr. Lee in 2016? Yes. And did he, or my understanding is Mr. Lee did not supply you with any additional materials? Answer, that's true. It was just a passing conversation. Where were you at the time of this conversation? I was somewhere in the office space of the law firm, of Mr. Lee's law firm. And I said, did he give you any discussion about doing the updated report? And we went on. And then I showed him in his deposition, because he said he couldn't remember, and he said, quote, I think you're going, this is Mr. Lee, going to want to update your report because Mr. Pugh has returned to work. And he goes, yes, all right, now, yeah, that's what happened. If you just want to give us the pages, we can read them, because your time technically is up. So if you want to summarize. I understand, Your Honor, and forgive me, but, you know, the implication in the brief from my opponent implied that I went on and on on this. I was not attacking the legal profession. This was somebody who was in Lee's office and testified to these things. And when I asked him questions about it, the witness was admitting to it all. So it wasn't going on and on. And the comment in the closing argument that Mr. Wimberly just referred to, that comment was, I did say that you had to, he was in Mr. Lee's office with another client of Mr. Lee's. The comments that you were reading about, but you didn't know why the objections were sustained, those were made after the courts, in plainest brief, at pages 44 and 45, from R415 through 417, where the trial court seemed to take great umbrage at what you were doing, and that you apparently continued on the same path, asking Mr. Blankenship about his relationship and dealings with Mr. Lee at Mr. Lee's office. Well, Your Honor, there was, that was a different, at the earlier points, in 417, 416, 17, and then the discussion that follows there, that is about the article that was written, and that I said you followed the game plan that's laid out. And the judge told me not to get into that anymore. So what I was doing then is I was going through the chronology of his work in the case, and what came up at what time. So that, the judge did not tell me that I could not cross-examine him about any, you know, contact with the plaintiff's attorney from that point forward, but I was, she had interpreted, based on Mr. Lee's comments, that I was trying to impugn Mr. Lee's character by the fact that he'd hired somebody who had written this article that was going to direct them to do it. And so, Your Honor, I believe that there, to go through the chronology and the further contact to call a very significant damage aspect, any question, was not improper. It was sustained, it was objected to and sustained, but it certainly didn't prejudice the plaintiff in this case. As we point out, none of this, and as Your Honor pointed out, Judge Fuse and the argument for the post-trial motion, there was actually, we made, I made personally an emergency motion to reset it because we had been in contact with plaintiff's counsel and said if you're going to make a post-trial motion, you can't just say there were errors. You've got to give us paid sites so we can deal with this. And then there was this whole issue with them not paying the court reporters so they weren't done. So I made... With all due respect, why do we need to hear that at this time? Because I believe all these issues are waived. All of these issues are waived. As Judge Fuse said, I can't address any of them. And what I'm saying is in our post-trial motion, we said we can't address any of them and are responsible. Thank you very much. Thank you. Mr. Wimberly. Mr. Wimberly, would it be all right if you addressed Ray's argument because you didn't touch on that? If I can respond very quickly to what counsel had just talked about. As I say, in 95 seconds or less. On the 213 issue, counsel seems to confuse making a general idea, saying, oh, there's literature out there, for making the very specific disclosure that's required about a particular issue of an opinion. They've done that on several occasions, just like with Dr. Zeldin. Oh, there's general information out there that we're going to talk about the pathology. But you have to do more than say I'm going to talk about the pathology. You have to say that L2 and L3 and L3 and L4 were the same in pathology. That's a specific disclosed opinion. They never did that. And they continue to say, well, if I throw everything in this 213, and I take umbrage because we're not saying that we were objecting because it was too extensive. We're saying it was too extensive with no substance. It wasn't specific at all about the things that it has to be specific about. So that's one thing. Also, counsel is trying to say that the very things that the judge had admonished him about, he just said it right now. The testimony was from Mr. Blankenship that took place in Lee's office space, not in his office. That's what garnered the judge's ire because she said no. He didn't say he was in his office. It was in his office building, his office complex. And right after that, within minutes, he repeats it before the judge, and that's what caused another sidebar, and that's when she got upset. She basically said this, and I'm going to read it to you. What's the objection? You're saying they did this, and I think you clearly are intending that the jury to conclude the plaintiff's attorney. Mr. Heaton, I will rephrase the court. Shame on you. Don't do it again. I am really surprised. The objection is sustained. And Mr. Lee says he's intentionally violated the motion to eliminate, and ordinarily it would be caused for mistrial, and also borderline professional misconduct is what he's doing. Then right 10 pages later, again, he makes a reference, and she says, It really does impact given you have injected the issue of some alleged conspiracy with these attorneys who are representing a client. And then again, I don't understand how counsel is saying, Well, maybe if it happened once, I can understand that. But it was time after time after time. It wasn't just once. It went from the beginning of the cross-examination of Mr. Blankenship all the way through closing arguments, when not only did he make a misstatement, he said that Zellbe stated that he would offer to take the, to I guess treat or even see the plaintiff, but somebody wouldn't let him. Clearly the inference is we didn't, that we were somehow withholding, just like it's consistent with the other things that the judge had already identified these amorphous they, that they were referring to is the plaintiff's attorneys. That's what the problem was. And that's what the judge was discussing. So when we're talking about the Ray Ipsa, I'm turning to Ray Ipsa. The main issues that we're bringing up regarding the Ray Ipsa was that it seems that the defense counsel says that it would never occur. But that's not the law regarding Ray Ipsa. It doesn't say that this kind of would never occur. It simply says that it doesn't normally occur without negligence being performed. For example, in this particular case. Did your own expert, though, Gertzbein testify that this is a, this is not a violation of the standard of care, just standing alone? No, he did not. What Gertzbein testified was that there's no per se rule that wrongs site surgery equals negligence. However, he did state that there has never been, I think, and you said, anytime that he's ever known for wrong site surgery at the location where we were, because in L2, L3, and L4, that he said there's never been an instance where he's known of anyone operating at the wrong level. All he said was that there's no per se rule that always it happens. He said, but in this case it does. And if I can retrace that with the argument before, the reason why Perlmutter's testimony about pathology at L2 becomes very clear now, and now at first they tried to say, well, it was just an observation, as you heard, but it clearly was responding to Gertzbein's testimony that when you got in and you saw that there wasn't the pathology that you expect to see at L2 and L3, that should raise a red flag to you that you're in the wrong space. That clearly showed that that was not just the observation. And so what Gertzbein said was all these red flags lead up to the fact that Dr. Perlmutter should have known that he was not in the right place, and he violated the standard of care. The only thing that he didn't say was that it's automatic just because it's wrong site surgery. But that's something that we need an expert for. I mean, your argument is part of your argument is that a layperson would know that if you operate at the wrong site of L2, L3, that that is Ray Ibsen. Well, the issue, I think the precise argument, and that is partial to what we're saying, it's very nuanced. The nuance is this. The reasons as to why they did it is another issue separate from Ray Ibsen. The justification is for it. However, the very nature of operations is to operate at the right place. It doesn't take a celebrated doctor to find out. If I go into the hospital to have my broken arm repaired, I'm not expecting them to set my leg. I'm expecting them to correct the place where I've been identified. The spine is a totally different area. I mean, you read the record. There's all kinds of testimony about how when you go in there, you don't really know where you are. That's why you use these markers and you use a radiograph and all that. I mean, if I was going to set your right arm and I set your left arm, I mean, I don't need a radiograph and a marker to tell me what your right arm is and what your left arm is. But in this situation, I need a radiograph to say am I in the right spot. And that's one of the reasons why Gerdspine testified that not all wrong site surgery is per se a violation of standard. Right, but he didn't say not all wrong site surgery at this location. That was not part of it. What they gave him was examples at a different level. All wrong site surgery at L2, L3 is a violation of standard of care. That's how you write his testimony. And say that, yeah, I'm subject. His testimony, the way you read it, is all, each and every wrong site surgery taking place at L2, L3 is per se negligence? No. Given these particular circumstances, given what Dr. Perlmutter did and what he failed to do is, that's what the testimony regarding the standard of care was. In regards to how radios would come up, even, you have to look at it from the standpoint, even if it's a common lay person, and we didn't get into that because the judge didn't actually speak about it. She simply said that she believed that there was an expert testimony that would be necessary, and I understand that. However, this very specific, what they're saying is that the reason why he made the mistake was because of this abnormality, the anatomical abnormality. And the reason why he made the mistake was because he put the coca marker in the wrong place, or as the doctor himself, who never disclosed about this anatomical abnormality at the deposition, he simply said, I just kind of missed it. I've seen this, I'm sorry, I straightened it. He said, I've seen this a few times. But when you look at it, he's basically saying that out of all these things, you expect for them to know where they are. You expect for them to see where they are. That's what they do. For the fact that they're saying, well, I got in, and now I don't know where I am, there were no testimonies that said that he didn't know where he was. Didn't Gertzbein testify that one could not see anything from the x-ray marker that could tell Perlmutter that he was in the wrong level of the spine? When he operated at the wrong site, he found the pathology he expected to find. Didn't Gertzbein say that? Gertzbein did indicate that looking at the marker, you couldn't tell. He did say that. He said, well, looking at the marker, and I believe he was referring to the COCA marker, so basically what he does is when they go in, they isolate whatever area of the lumbar spine they're going to operate on. They put basically a clamp in the area where they think that they need to operate on, and then they go in. He's saying just looking at that, you couldn't tell. You couldn't tell where you were. However, the other issues that presented themselves to the doctor at the time, including the lack of pathology that should have been there, the disc degeneration at the level that Perlmutter said it was, from the x-ray that he himself took just three weeks prior to it. In that x-ray, he himself said that the rest of the spine, except for the L3, L4, and L5, appears normal. Those are words from Dr. Perlmutter. And in addition to that, Perlmutter made no references at all in his post-op report after the first surgery of any of these issues. It was only after they discovered that they operated in the wrong place that now when he comes back in for the second surgery, now here's the laundry list of all these problems and issues. That was never an issue at first when he thought he was in the right place. Why? Because he didn't see the pathology there because it was not there. It wasn't the right place. He saw it after your experts testified to it. No, he saw it after the first botched surgery, when they went back in and had to go back in and put my client under the knife again, when they had to subject him to the dangers of surgery a second time. Now, after that, now you have all of this post-op report saying all these various problems with the back that would have been able to be seen the first time. We contend, and because of that, we believe that our clients were denied a fair trial. Thank you for your concern. Thank you, counsel, for your arguments here this afternoon. We are now going to stand adjourned, and we will issue a decision in this matter in due course. Thank you very much.